**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CAROL A. WILSON, ADMINISTRATOR,** | : | |
| *et al.*, | : | |
| | : | **Case No. 2:14-CV-00156** |
| **Plaintiffs,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **BRIDGE OVERLAY SYSTEMS, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

## I.     INTRODUCTION

Administrator and Trustees of the Ohio Operating Engineers Health & Welfare Plan, the

Ohio Operating Engineers Pension Fund, the Ohio Operating Engineers Apprenticeship Fund,

and the Ohio Operating Engineers Safety & Education Fund (collectively "Plaintiffs"), move this

Court for Summary Judgment, pursuant to Fed. R. Civ. P. 56(a), against Bridge Overlay

Systems, Inc. ("Defendant") for allegedly delinquent fringe benefit contributions, as well as

interest, liquidated damages, attorneys' fees and costs resulting from Defendant's failure to pay

such benefits contributions. (Doc. 32). Plaintiffs assert that Defendant is obligated to pay the

delinquent contributions under a collective bargaining agreement, to which they allege

Defendant is a party. Defendant filed a Cross-Motion for Summary Judgment under Fed. R. Civ.

P. 56(a), in which it raises several defenses to the Plaintiffs' collection action. (Doc. 23). For the

reasons stated herein, Plaintiffs' motion is **GRANTED**, and Defendant's motion is **DENIED**.

1

## II. BACKGROUND

### A. Factual Background

Plaintiffs are the Administrator and Trustees of the Ohio Operating Engineers Health & Welfare Plan, the Ohio Operating Engineers Pension Fund, the Ohio Operating Engineers Apprenticeship Fund, and the Ohio Operating Engineers Safety & Education Fund ("the Funds"). The Funds are jointly-administered multi-employer fringe benefit programs established for the benefit of employees of contractors who are signatories to a collective bargaining agreement ("CBA") between the International Union of Operating Engineers, Local Nos. 18, 18A and 18B ("the Union") and the Labor Relations Division of the Ohio Contractors Association. The CBA is titled the "Heavy Highway Equipment Agreement."

Bridge Overlay Systems is a bridge resurfacing contractor. Larry Berasi is the owner of Bridge Overlay Systems. In 2006, a business agent of the Union approached Berasi to sign some agreements with them. On April 18, 2006, Berasi signed an agreement titled, "Ohio Residential Light Commercial Agreement with International Union of Operating Engineers, Local 18 and its Branches, AFL-CIO," ("Light Commercial Agreement"). The first paragraph of the Light Commercial Agreement states that it:

> [s]hall be known as the Ohio Residential Light Commercial Agreement, effective May 15, 2004 and shall be terminated without automatic renewal on May 15, 2007. As a condition precedent to execution of this Agreement, the Company [Bridge Overlay] must execute another Agreement with the Union covering highway heavy construction work which has been reduced to writing and is known as the Ohio Highway Heavy Agreement between the Union and the Labor Relations Division of the Ohio Contractors Association, or any "short form" adaptation of the aforestated Agreement, hereinafter called the "Master Agreement."

The remaining portions of the Light Commercial Agreement details: the work scope, which includes private residential housing projects and public housing projects; the wage rates,

2

reporting pay, and overtime pay rules for such residential projects; and rules for employing apprentices on such projects. Article VII, § 1 of the Light Commercial Agreement declares that "[t]he only terms intended are as written in this Agreement. All terms and conditions of the 'Master Agreement' shall remain in full force and effect except as modified by the Agreement."

On the same day, Berasi signed a separate sheet of paper entitled, "Acceptance of Agreement." It was unattached to any other papers. It read, in its totality:

> In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the Labor Relations Division of the Ohio Contractors Association, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the Labor Relations Division of the Ohio Contractors Association with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits and agrees to be bound by any Trust Agreements hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees to administer said funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Berasi also signed a series of letters that day, which the Union called "Letters of Assignment." The Union faxed the letters to Berasi, and instructed him to copy the contents of the proposed letters onto Bridge Overlay letterhead, sign them, and send them back to the Union. Berasi thought that the letters defined what pieces of equipment were covered by the 2006 Acceptance of Agreement, and believed that these letters were incorporated into the Acceptance of Agreement. The standard letter read as follows:

> We have reviewed our equipment needs as they relate to Decisions of Record and Trade Agreements. As a result of that review, we find that equipment, such as our **Rubber Tire Hoe**, properly falls within the jurisdiction of the Operating Engineers.
>
> We, therefore, assign the operation, maintenance, repair, assembly and disassembly of these machines, used on our projects as required in work

undertaken by our company, to the International Union of Operating Engineers, Local 18.

This assignment stands whether the work required is full time or intermittent. It is understood that the Operating Engineer **Rubber Tire Hoe** operator may have to assist in other areas in order to fill in his/her day productively.

Thank you,

Larry C. Berasi.

In addition to signing a letter assigning the Rubber Tire Hoe, Berasi signed identical letters for the following pieces of equipment: Any Excavator, Skid Steer Loaders, Bobcats, Industrial/Rt. Forklift, Loadall. After Berasi faxed the letters back to the Union, the Union sent him a booklet containing the Heavy Highway Equipment Agreement. A review of the Heavy Equipment Agreement booklet shows that the final page contains the "Acceptance of Agreement" contract which Berasi signed on April 18, 2006. Berasi attests that when he signed it, however, it was unattached to the booklet.

Article V of the Heavy Highway Equipment Agreement deals with Fringe Benefit Programs. Article V, § 34 states: "The fringe benefit provisions contained herein shall apply to all Employer members of the Labor Relations Division of the Ohio Contractors Association . . . all Employers who become signatory, or bound by this Agreement." Article V, § 35 states: "Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement . . . ;" then, it lays out the relevant rates. Finally, Article XI, Term of Agreement, § 90 states: "This Agreement shall be effective as of May 1, 2004 and shall continue in force and effect  through April 30, 2007 and thereafter, from year to year, until terminated at the option of either party after sixty (60) days notice in writing to the other party."

After Berasi signed the series of documents and letters on April 18, 2006, he did not sign any more agreements with the Union until 2012. In July 2012, a Union business agent approached him again who wanted Bridge Overlay to execute an agreement with the Union. On July 17, 2012, Berasi signed an Acceptance of Agreement, unattached to any other papers, which was identical to the one he signed in 2006. He also signed a series of "Letters of Assignment," which were identical to those signed in 2006. The letters, once again, defined which pieces of equipment were under the jurisdiction of the Union. As before, after faxing the letters back to the Union, the Union sent Berasi a booklet containing the "Heavy Highway Equipment Agreement."

On February 13, 2014, Plaintiffs filed a complaint alleging that Defendant failed to submit to an audit. Thereafter, the parties entered into a Stipulation and Order under which Defendant consented to an audit of its payroll records. The audit covered the period April 1, 2006 through April 1, 2014. It indicated that Defendant owes $190,800.45 in unpaid fringe benefit contributions, inclusive of $74,822.58 in late charges. All but a minimal amount of the unpaid fringe benefit contributions stem from one employee, Richard Miller.

Since 1994, Miller has worked for Defendant performing services as a driver, paving supervisor, Bidwell Paver operator, and heavy equipment operator. Before 2007, Miller operated heavy equipment on a limited basis; the last time was in 2006. Miller has operated the Bidwell Paver during the last eight years of his career, and has not operated any other construction equipment on job sites covered by the Operating Engineers Union. The Bidwell Paver was not included in the letters detailing the equipment covered by the agreement, nor is the Bidwell Paver mentioned within the 2006 or 2012 agreements with the Union. In 2006, when Miller operated machinery other than the Bidwell Paver, Defendant made payments within the scope of the agreement with the Union to the Union's Pension Fund, and the Health & Welfare Plan for

5

the benefit of Miller. Miller has been a dues-paying member of the Union since 1985. In the past 29 years, less than $2,000 in contributions to the Union's Pension Fund, and the Health & Welfare Plan have been paid for his benefit.

Berasi avers that from 1994 to present, representatives of the Union have visited Bridge Overlay and observed Miller operating the Bidwell Paver, but they never made a claim for payments to the Funds for Miller until the commencement of this action. From 1994 to the present, Berasi asserts that he has paid Miller prevailing wages, which have included amounts equivalent to the payment of benefits to the Funds. If the Union had sought such benefits, Berasi insists that he would have addressed the issue then, and not paid the prevailing wages to Miller. Instead, he would have escrowed the money until the controversy was resolved.

### B.  Procedural Background

On February 13, 2014, Plaintiffs filed a complaint pursuant to the Labor Management Relations Act, 29 U.S.C. § 185(a), and Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3) and 1145, seeking a court order that Defendant submit to an audit to determine any delinquent fringe-benefit contributions to the Funds, and enjoining Defendant from any further violations of the Ohio Residential and Light Commercial Agreement and Acceptance of Agreements. On May 28, 2014, Plaintiffs filed an Amended Complaint seeking collection of delinquent fringe-benefit contributions identified in the audit of Defendant's payroll records, as well as interest, for the period of April 1, 2006 to April 1, 2014. Defendant answered the Amended Complaint on June 10, 2014 and raised several defenses. On January 7, 2015, both parties filed cross-motions for summary judgment. On February 6, 2015, Plaintiffs filed an amended motion for summary judgment. Both motions have been fully briefed and are ripe for review.

### III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992).  Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404–05.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the

motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995); *see also Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).

## IV.   ANALYSIS

Plaintiffs assert that the undisputed facts show that Defendant was bound by the CBAs, but failed to make the requisite contributions to the Funds pursuant to them. Accordingly, they assert that they are entitled to summary judgment as a matter of law in the uncontested amounts established by the audit. Plaintiffs explain that in addition to Defendant's contractual obligation, Defendant has a statutory obligation pursuant to 29 U.S.C. § 1145 (§ 515 of ERISA) to make the fringe benefit contributions. Thus, Plaintiffs contend that once Defendant signed the "Acceptance of Agreement" binding him to the collective bargaining agreement, he assumed not only a contractual obligation to make payments to the Funds in accordance with the terms of the CBA, but also a duty under federal law to comply with the terms and conditions of the plans, trust and collective bargaining agreement.

Defendant responds that he is not liable for any unpaid contributions to the Funds for the following reasons: (1) the CBA is unenforceable against the Defendant because the "Acceptance of Agreement" lacks definite terms binding Defendant to the CBA; (2) even if the CBA is legally enforceable against Defendant, Defendant has no contractual obligation to pay any contributions to the Funds after May 15, 2007, the date the Light Commercial Agreement automatically terminated, and before July 17, 2012, the date the Defendant signed a new "Acceptance of Agreement;" (3) Defendant has no contractual obligation to pay contributions to the Funds

8

allegedly due for Richard Miller while he was employed for services outside the scope of the CBA, specifically while he was operating the Bidwell Paver; (4) Plaintiffs should be equitably estopped from recovering any contributions from Defendant; (5) Plaintiffs should be barred from recovery under the doctrine of laches.

The Court will analyze each of Defendant's arguments *seriatim*, but first will address applicable law pertaining to collection actions brought by plan trustees to collect delinquent fringe benefit contributions from employers who are parties to collective bargaining agreements.

## A.  Applicable Law

If a collective-bargaining agreement creates pension or welfare benefits plans, those plans are subject to rules established in ERISA. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933, 190 L. Ed. 2d 809 (2015). ERISA requires parties to enter into written agreements governing the creation and management of multi-employer fringe benefit funds, such as those included in collective bargaining agreements. *Orrand v. Scassa Asphalt, Inc.*, No. 14-3954, 2015 WL 4430447, at *4 (6th Cir. July 21, 2015); *Operating Engineers Local 324 Health Care Plan v. G & W Construction Company,* 783 F.3d 1045, 1050–51 (6th Cir. 2015). The Sixth Circuit in *Orrand v. Scassa Asphalt, Inc.* recently delineated the requirements of and purposes behind the ERISA writing requirement:

> It is one of "ERISA's core functional requirements" that each "employee benefit plan shall be established and maintained *pursuant to a written instrument.*" *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (quoting 29 U.S.C. § 1102(a)(1)). Every employee benefit plan must "specify the basis on which payments are made to and from the plan," 29 U.S.C. § 1102(b)(4), and "[t]he plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with' " ERISA provisions. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* 555 U.S. 285, 300, 129 S.Ct. 865, 172 L.Ed.2d 662 (2009) (quoting 29 U.S.C. § 1104(a)(1)(D)).

9

> This "reliance on the face of written plan documents" serves the purpose of "enabling beneficiaries to learn their rights and obligations at any time." *Curtiss–Wright Corp.,* 514 U.S. at 83. It also lends certainty and predictability to employee benefit plans, serving the interests of both employers and their employees. *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 402 (6th Cir.1998) (*en banc*).
>
> For benefit plans established through collective bargaining, the writing requirement is further reinforced by Section 302 of the LMRA, 29 U.S.C. § 186(a), which bars an employer from contributing to benefit trusts designated by employee representatives unless the payments are "made in accordance with a written agreement with the employer." *Behnke, Inc.,* 883 F.2d at 459 (citing 29 U.S.C. § 186(c)(5)(B)). The general prohibition on contributing funds to employee representatives without written agreements seeks to prevent misappropriation and dissipation of monies that are owed to the employees.

*Orrand*, 2015 WL 4430447, at *4.

In a collection action brought by plan trustees to collect delinquent fringe benefit contributions from employers who are a party to a collective bargaining agreement, §515 of ERISA comes into play. It: "protects and streamlines the process for collecting delinquent contributions to ERISA plans from employers by limiting 'unrelated' and 'extraneous' defenses." *Orrand*, 2015 WL 4430447, at *4 (citing *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 88 & n. 12, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982)). Section 515 reads:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Congress adopted § 515 to "simplify delinquency collection" brought by plan trustees because such collection actions were "being converted into lengthy, costly and complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions . . . ." *Orrand*, 2015 WL 4430447, at *5 (quoting *Kaiser Steel Corp.*, 455 U.S. at 87).

10

Pursuant to § 515, the Sixth Circuit has consistently found that employers' written promises to pay contributions to a multiemployer plan "are enforceable if they are not inconsistent with law." *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1153 (7th Cir.1989) (en banc)). This rule flows from the practical consideration that "[m]ulti-employer p]lans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits . . . . Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize . . . . Costs of tracking down reneging employers and litigating also come out of money available to pay benefits." *Id.* (quoting *Gerber Truck Serv., Inc.,* 870 F.2d at 1153).

Thus, motivated by the practical consideration that constantly miring plan trustees—who are third-party beneficiaries to collective bargaining agreements—in time-consuming and expensive collection litigation would threaten their solvency, as well as Section 515, this Circuit has found " 'that ERISA funds are accorded a special status and are entitled to enforce' the written contracts, without regard to the understandings or common-law contract defenses of the original parties, similar to a holder in due course in commercial law." *G & W Const. Co.*, 783 F.3d at 1053 (citing *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.,* 270 F.3d 1018, 1025 (6th Cir.2001); *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio,* 133 F.3d 955, 959 (6th Cir.1998)). Accordingly, employers' defenses to collection actions based on union conduct during contract formation are extremely limited. *See Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.,* 883 F.2d 454, 459, 460 (6th Cir.1989). Thus far, this Circuit has only permitted the following defenses to a collection action: illegality of the contributions, the contract requiring the contribution was void at its inception, the union was decertified, and a limited contract termination defense. *G & W Const. Co.*, 783

11

F.3d at 1056. Thus, while the defense of fraud in the execution precludes the employee benefit fund from collecting, as it renders an agreement void *ab initio*, "fraud in the inducement makes the transaction merely voidable, and cannot cut off the fund's claims." *Orrand*, 2015 WL 4430447, at *5 (quotations and citations omitted). Unless the employer raises the defense of fraud in the execution, "then the words, conduct, action, and inaction of the union are simply not relevant to a § 515 collection action that is based on the literal and unambiguous terms of an existing ERISA plan document or collective bargaining agreement." *Id*. In sum, "[t]he Funds are entitled to rely on the written terms of an existing ERISA plan document or collective bargaining agreement . . . irrespective of any breach or omission by the union . . . because the funds often are not in a position to know what is going on between the employer and the union, and the union may have interests that differ from or are inimical to the funds' interests." *G & W Const. Co.*, 783 F.3d at 1053 (6th Cir. 2015) (quotations and citations omitted).

In interpreting ERISA plans, "federal courts apply 'general rules' of contract law as part of the federal common law." *Orrand*, 2014 WL 4272722, at *4 (citing *Hunter v. Caliber Sys., Inc.,* 220 F.3d 702, 712 (6th Cir.2000); *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 556 (6th Cir.1998)). "Ordinary contract principles govern the interpretation of collective bargaining agreements that establish ERISA to the extent those principles are not inconsistent with federal labor policy. . . 'Where the words of an [ERISA Plan] in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.' " *G & W Const. Co.*, 783 F.3d at 1051 (citing and quoting *M & G Polymers USA, LLC*, 135 S.Ct. at 933 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed.2012) (internal quotation marks omitted))). "In the absence of controlling federal law principles . . . we may look for guidance to general common law principles, including the substantive law of the state in which the contract

arose. These borrowed principles in this context, of course, are 'absorbed as federal law' and become the federal common law of labor disputes.' " *Orrand*, 2014 WL 4272722, at *3-4 (quoting *Int'l Union v. Yard–Man,* 716 F.2d 1476, 1487 (6th Cir.1983)).

### B. Enforceability of the CBA against Defendant

Defendant argues that when read in combination, the Light Commercial Agreement and the Acceptance of Agreement, both of which Berasi signed on April 18, 2006, do not contain sufficiently definite terms to bind Defendant to the CBA, actually titled the "Ohio Highway Heavy Agreement." *See Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Relations*, 61 Ohio St. 3d 366, 369, 575 N.E.2d 134, 137 (1991) ("In order to declare the existence of a contract, both parties to the contract must consent to its terms; there must be a meeting of the minds of both parties; and the contract must be definite and certain.") (citations omitted).

The opening paragraph of the Light Commercial Agreement states that as a condition precedent to entering into it, Bridge Overlay was obligated "to execute another Agreement with the Union covering highway heavy construction work which has been reduced to writing and is known as the Ohio Highway Heavy Agreement between the Union and the Labor Relations Division of the Ohio Contractors Association or any 'short form' adaptation of the aforestated Agreement, hereinafter called the 'Master Agreement.' " Berasi also signed on April 18, 2006 a brief contract titled, "Acceptance of Agreement." The Acceptance of Agreement was unattached to any other papers, and read in its totality:

> In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the Labor Relations Division of the Ohio Contractors Association, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the Labor Relations Division of the Ohio Contractors Association with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension,

13

Apprenticeship Training, or any other fringe benefits and agrees to be bound by any Trust Agreements hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees to administer said funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Defendant asserts that it is unclear from these two agreements, when read together, that he was binding himself to the Ohio Highway Heavy Agreement, which is called the "Master Agreement" in the Light Commercial Agreement, but is called the "collective bargaining agreement" in the Acceptance of Agreement. Indeed, the Acceptance of Agreement refers neither to a Master Agreement nor to a Ohio Highway Heavy Agreement. Instead, it states that the undersigned contractor becomes a party to "the collective bargaining agreement heretofore made by the Labor Relations Division of the Ohio Contractors Association with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO)." Defendant contends, therefore, that although the Acceptance of Agreement states that by signing it he becomes a party to the collective bargaining agreement "heretofore," it is unclear to which agreement "heretofore" refers. In sum, Defendant asserts that this Court cannot determine within the four corners of the Acceptance Agreement to which CBA it refers, and/or any of the CBA's terms, including those governing the contributions which Bridge Overlay allegedly agreed to make by signing the Acceptance of Agreement. Defendant claims it would be improper for this Court to construe the Acceptance Agreement to refer to a specific contract, as such an action would require this Court to engage in rewriting the contract, which is not permissible. *See Trustees of B.A.C. Local 32 Ins. Fund v. Fantin Enterprises, Inc.,* 163 F.3d 965, 969 (6th Cir. 1998) (determining that since the termination clause in the CBA was unambiguous, the court "would effectively rewrite the terms of these contracts" were it to find that a subsequent agreement terminated the CBA, an action it was not permitted to take).

A review of the Light Commercial Agreement, the Acceptance of Agreement and the Ohio Highway Heavy Agreement (the CBA) makes evident that the Acceptance of Agreement is simply the final, signatory page of the booklet containing the complete Ohio Highway Heavy Agreement. Thus, the term "heretofore" in the Acceptance Agreement refers to the over 80 preceding pages containing the terms and conditions of the Ohio Highway Heavy Agreement. It follows that the Ohio Highway Heavy Agreement is the official title of the CBA between the Labor Relations Division of the Ohio Contractors Association and the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO). Berasi asserts that the signatory page was not attached to the CBA booklet when Berasi signed it, and that Berasi only received the booklet containing the complete terms and conditions of the CBA after he signed the agreements and the letters. The question before this Court, then, is whether the alleged ambiguities in referring to the Ohio Highway Heavy Agreement in the Acceptance of Agreement and Light Commercial Agreement render the term in the Acceptance of Agreement binding the Defendant to the CBA so indefinite that the CBA is unenforceable against it.

Although Defendant frames this issue as a question of contract interpretation, it is better framed as a fraud in the execution claim. This is because the dispute can be distilled to the question of whether the Union's conduct in failing to attach a copy of the CBA to the Acceptance of Agreement, which would have avoided any ambiguities, caused the Defendant to believe, with excusable ignorance, that he had not signed onto the larger CBA, including its terms obligating him to make contributions to benefits funds. *See Orrand*, 2014 WL 4272722, at *6 (S.D. Ohio Aug. 29, 2014) (Sargus, J) *aff'd,* No. 14-3954, 2015 WL 4430447 (6th Cir. July 21, 2015). After all, had the Union attached a copy of the CBA to the Acceptance of Agreement, Defendant would be unable to argue that the term of the Acceptance of Agreement binding

15

Defendant to the CBA was ambiguous. As explained *supra*, only fraud in the execution is a valid defense in a collection action, while fraud in the inducement is not. *Id.* at *5.

This case is analogous to *Orrand v. Scassa Asphalt, Inc.* Where the defendant claimed that since the union did not provide a copy of the full CBA when the defendant signed a short-form of the CBA, it did not understand itself to be bound to make fringe-benefits payments pursuant to the terms of the CBA. Thus, Defendant argued, the terms of the CBA were unenforceable against it. 2014 WL 4272722, at *6. Based on these facts, the defendant raised the defense of fraud in the execution:

> 'Fraud in the execution causes a party to believe that the agreement it signs has essential terms different from those that actually appear in the contract.' *Electric Workers Local 58 Pension Trust Fund v. Gary's Elec. Serv. Co.,* 227 F.3d 646, 656 (6th Cir.2000) (citing *Hetchkop,* 116 F.3d at 32). In the Sixth Circuit, to demonstrate the excusable ignorance necessary to maintain a fraud-in-the-execution theory, the theorizing party bears the burden to demonstrate that it fulfilled its 'basic responsibility ... to review a document before signing it.' *Gary's Electric Serv. Co.,* 227 F.3d at 657 (citing *Hetchkop,* 116 F.3d at 34).

*Id*. at *5.

The *Orrand* court noted that the short-form agreement stated that the company agreed to "adopt and accept all the terms, wage rates and conditions of the 2007-2010 Ohio Highway Heavy Agreement ... The Company further agrees to make contributions to the Health and Welfare Fund, Pension Fund, Apprenticeship Fund and Safety Training and Education Trust Fund as outlined in said Ohio Highway Agreement." *Id*. at *6. Further, the court found that the defendant had signed two other agreements, both of which referred to the defendant's obligation to make payments to the fringe-benefit funds. *Id*. Pursuant to both findings, the court held that even if the defendant never received a copy of the CBA, it "was not relieved of its 'basic responsibility . . . to review a document before signing it.' " *Id*. (citing *Gary's Electric Serv. Co.,*

227 F.3d at 657 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 34 (2d Cir.

1997)). The *Orrand* court reasoned that had the defendant

> reviewed the three contracts that it signed it could not have failed to understand
> that it was agreeing to join the union, Local 18, to pay into various funds, and to
> be bound by the larger agreement that was incorporated and referenced in every
> document that it signed.
>
> > It will not do for a man to enter into a contract, and, when called upon to
> > respond to its obligations, to say that he did not read it when he signed it, or
> > did not know what it contained. If this were permitted, contracts would not
> > be worth the paper on which they are written. But such is not the law. A
> > contractor must stand by the words of his contract; and, if he will not read
> > what he signs, he alone is responsible for his omission.

*Id.* at *6-7 (citing *McAdams v. McAdams,* 80 Ohio St. 232, 88 N.E. 542, 544 (Ohio 1909)

(quoting *Upton v. Tribilcock,* 91 U.S. 45, 50, 23 L.Ed. 203(1875))). Thus, the court held that the

defendant could not establish a fraud in the execution defense.  *Id*. at *7. Though it may have

been possible to prove fraud in the inducement, such was not a valid defense to an ERISA

collection action pursuant to a collective bargaining agreement. *Id*.

Like in *Orrand*, the Defendant in this case contends he did not receive and thus did not

review the full CBA upon signing the short-form agreement. Accordingly, the Defendant claims,

like in *Orrand*, that it cannot be bound by the terms of the CBA obligating it to make fringe-

benefits contributions because it was not sufficiently clear from the Acceptance of Agreement to

which collective bargaining agreement it was binding itself, and thus which dates or terms of the

CBA to which it was binding itself.

This Court adopts the rationale in *Orrand* and finds that, contrary to Defendant's

protestations, the Union's failure to provide the Defendant with a copy of the CBA prior to

Defendant signing the Acceptance of Agreement does not relieve the Defendant of its " 'basic

responsibility ... to review a document before signing it.' " *Orrand*, 2014 WL 4272722, at *6.

Although the short-form agreement in *Orrand* referred to the CBA as the Ohio Highway Heavy Agreement, and the Acceptance of Agreement in this case only uses the term "collective bargaining agreement," the short-form agreements in both cases state unambiguously that the Defendant agreed to become a party to the CBA, and agreed to accept terms "pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits and agrees to be bound by any Trust Agreements hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees to administer said funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned." Further, the Light Commercial Agreement refers to the Company's obligation to make payments to fringe benefits programs in Article II, Wage Rates, § 1, which states that the May 15, 2004 wage increase outlined in the Agreement "will be diverted to fringe benefits."  In addition, § 6 states, "[f]ringe benefits, contributions and deductions from the wages shall, in all cases, be the same as those contained in the 'Master Agreement.' " Thus, as in *Orrand*, Defendant cannot now claim excusable ignorance that it was binding itself to a larger agreement mandating that it make fringe-benefits contributions. Defendant's failure to request a copy of the agreement to which it was binding itself, to read carefully the two agreements, or to seek clarification or specification, cannot now defeat the Plan's right to enforce the terms of the CBA to which Defendant is a signatory. *See Gerber Truck Serv.,* 870 F.2d at 1153 ("The Funds are entitled to rely on the written terms of an existing ERISA plan document or collective bargaining agreement.").

Defendant argues that *Orrand* is not analogous because the short-form agreement in that case referred to the CBA as the Ohio Heavy Highway Agreement, and thus there was no question to which agreement the defendant in *Orrand* was bound. The only issue in that case,

therefore, was that the defendant never received a copy of the long-form agreement. A more than cursory read of both the Light Commercial Agreement and the Acceptance of Agreement, however, shows that they both refer to an agreement between the same two parties, which put Defendant on sufficient notice that they both referred to the same agreement. The title of the Light Commercial Agreement is: "International Union of Operating Engineers, Local 18 and its Branches, AFL-CIO Ohio Residential Light Commercial Agreement." Then, the first paragraph refers to the Ohio Heavy Highway Agreement or Master Agreement between the Union—which, according to the title of the agreement, can only be interpreted to be the International Union of Operating Engineers, Local 18 and its Branches, AFL-CIO—and "*the Labor Relations Division of the Ohio Contractors Association*." Similarly, the Acceptance of Agreement refers to the CBA as an agreement between the "Labor Relations Division of the Ohio Contractors Association with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO)." In short, Defendant cannot succeed in a claim for "excusable ignorance necessary to maintain a fraud-in-the-execution theory," because it cannot "demonstrate that it fulfilled its 'basic responsibility ... to review a document before signing it.' " *Orrand*, 2014 WL 4272722, at *5 (citing *Gary's Electric Serv. Co.,* 227 F.3d at 657 (citing *Hetchkop,* 116 F.3d at 34)).

Further, the record shows that Defendant did eventually receive a copy of the CBA, and it made contributions to the Fund pursuant to the CBA for some, but not all, of his employees' paid work hours. Although such extrinsic evidence is not vital to this Court's determination, from an equitable perspective, it shows that Defendant understood that it was bound by the terms of the CBA, mandating that it make fringe-benefits contributions on behalf of its employees.

## C. Termination Date of the CBA

Defendant insists that even if this Court finds that the 2004-2007 CBA is enforceable against it, summary judgment is still appropriate for any sums allegedly due from May 15, 2007, the date the Light Commercial Agreement terminated, through July 17, 2012, the date Defendant signed the new Acceptance of Agreement. The Light Commercial Agreement states that it "shall be terminated without automatic renewal on May 15, 2007." In contrast, the Acceptance of Agreement fails to provide any term of termination within its four corners, and the CBA states it "shall be effective as of May 1, 2004 and shall continue in force and effect through April 30, 2007 and thereafter from year to year until terminated at the option of either party after sixty (60) days notice in writing to the other party." Thus, Defendant contends that a conflict exists between the termination dates in the Light Commercial Agreement and the CBA. To resolve this conflict, the Defendant urges this Court to rely on Article VII, § 1 of the Light Commercial Agreement which provides: "The only terms intended are as written in this Agreement. All terms and conditions of the 'Master Agreement' shall remain in full force and effect except as modified by this Agreement." Defendant claims that pursuant to Article VII, § 1, the termination provision of the Light Commercial Contract supersedes and modifies the evergreen clause in the CBA, rendering the termination date as to both contracts May 15, 2007.

This Court finds no conflict. Whether an ERISA plan's language is straightforward or ambiguous is a question of law. *Lewis v. Cent. States, Se. & Sw. Areas Pension Fund*, No. 1:09-CV-569, 2010 WL 3603206, at *14 (S.D. Ohio June 24, 2010) *report and recommendation adopted sub nom. Lewis v. Cent. States Se. & Sw. Areas Pension Fund*, No. 1:09CV569, 2010 WL 3605204 (S.D. Ohio Sept. 10, 2010) *aff'd*, 484 F. App'x 7 (6th Cir. 2012) (citing *In re Unisys Corp. Long-term Disability Plan ERISA Litig.*, 97 F.3d 710, 715 (3d Cir.1996)). A general rule

20

of contract interpretation is that the court must adhere to the plain language of the contract as it would be construed by an ordinary person.  *Id*. (citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir.2004)).

First, although as a condition precedent to the enforceability of the Light Commercial Agreement the Defendant was required to sign the CBA, the CBA remains a standalone agreement and both agreements include separate and unique terms. As the Plaintiffs clarified at oral argument, while the Ohio Highway Heavy Agreement covers highways projects, the Light Commercial Agreement is a "concessionary agreement by the Union wherein the Union carves out specific types of work." The work tends to include smaller projects, where contractors cannot make as much money, so the Union concedes that the contractors can pay Union members a lower wage rate than is otherwise paid under the Master Agreement. Thus, although the termination date in each contract is different, they are not in conflict, as both agreements stand alone, and exist for different purposes.

In order for the termination date of the Light Commercial Agreement to have modified the evergreen clause of the CBA, therefore, the language in the Light Commercial Agreement must have been unambiguous. No language in the Light Commercial Agreement, however, indicates that its termination date modified and is binding as to the termination date in the Master Agreement. Compare the termination clause in the Light Commercial Agreement to the language in its Article VII, § 2: "This Agreement is not subject to the 'Most Favored Nations Clause' contained in the 'Master Agreement' and the Company agrees that neither it nor any of its representatives, will attempt to invoke the 'Most Favored nations Clause' on any projects outside the scope of this agreement." Such language demonstrates that the drafters of the Light Commercial Agreement knew how to modify with sufficient specificity the application of the

21

Master Agreement's terms and conditions on the Light Commercial Agreement's terms and conditions. No such language exists expressly modifying the termination date of the Master Agreement.

*Trustees of B.A.C. Local 32 Ins. Fund v. Fantin Enterprises, Inc.*, 163 F.3d 965 (6th Cir. 1998) is instructive. In *Fantin*, the Sixth Circuit addressed the question of whether a 1992 version of a CBA, to which the employer was not a signatory, terminated his obligations under the 1991 version of the CBA, to which it was a signatory. The Sixth Circuit found that:

> the termination clause in the 1991 agreement provides clear, unambiguous terms upon which the contract may be canceled: through written notice by either party of their intent to terminate it. A careful examination of this agreement reveals no language suggesting that the simple existence of a later contract, in which one party was not even involved, could act as the written termination of the 1991 contract. Further, nothing in the 1992 contract suggests that it was meant to serve as written termination of the 1991 agreement.

*Id.* at 969. Though the facts of *Fantin* and this case are somewhat different, the general proposition in *Fantin* is applicable here. In this case, like in *Fantin*, the CBA is clear and unambiguous that it may only be canceled through written notice by either party. Further, like in *Fantin* regarding the 1992 agreement, nothing in the Light Commercial Agreement suggests that it modified the termination clause of the CBA simply because it contains a termination date that differs from the CBA's. Thus, this Court finds Defendant's termination argument unavailing.

In the alternative, Defendant makes two arguments. First, Defendant asserts that in light of the conflicting termination dates, this Court should construe the ambiguity in the termination dates against the Plaintiffs, as Defendant did not draft either document. *Lewis v. Cent. States, Se. & Sw. Areas Pension Fund*, No. 1:09-CV-569, 2010 WL 3603206, at *14 (S.D. Ohio June 24, 2010) *report and recommendation adopted sub nom. Lewis v. Cent. States Se. & Sw. Areas Pension Fund*, No. 1:09CV569, 2010 WL 3605204 (S.D. Ohio Sept. 10, 2010) *aff'd*, 484 *F.*

*App'x* 7 (6th Cir. 2012) ("Under the rule of *contra proferentem*, where contract terms are ambiguous, courts construe ambiguities against the drafter, or in this context, the trustees."). This argument is not well taken. This Circuit has held consistently that the *contra proferentem* rule of construction argument cannot be raised against plan administrators, who are not the drafters of the CBAs which they enforce, and whose interpretations of CBA language are afforded deferential review. *Id.*

Second, the Defendant urges the Court to consider extrinsic evidence of the intent of the parties, including the Union's and the Plaintiffs' silence and other inactions and omissions from at least 2007 until the commencement of this action. This argument similarly is not well taken. The Sixth Circuit has "consistently stated that extrinsic evidence should only be admitted after a provision has been found to be ambiguous." *Tate v. Gen. Motors LLC*, 538 F. App'x 599, 603 (6th Cir. 2013) (finding that since the retiree had not established that the provision at issue was ambiguous, extrinsic evidence was not needed) (citing *Pollett v. Rinker Materials Corp.*, 477 F.3d 376, 380 (6th Cir. 2007)). This Court determined above that it was unambiguous that the Light Commercial Agreement did not modify the CBA's evergreen clause. Accordingly, extrinsic evidence is not needed at this stage in the litigation.

### D. Obligation to Make Contributions to the Funds on Behalf of Richard Miller

Defendant maintains that it is not obligated to pay fringe benefit contributions for paid work-hours that Richard Miller performed using the Bidwell Paver because that work is not covered by Article II, Provisions and Limitations, § 4 of the CBA, which reads, in pertinent part:

> The Employer will employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair of the following construction equipment, regardless of motive power: Air Compressors, Backfillers, Batch Plants, Boilers, Cableways, Connection Machines, Derricks, Concrete Mixing Plants, Shovels, Hoes, Keystone Graders, Paving Mixers, Piledriving Machines, Tractors, Ole Tourneau and other types of Scoops, End

23

Loaders and all like equipment within the jurisdiction assigned to the Union by
the American Federation of Labor.

Further, Defendant contends that under the Letters of Assignment which Berasi signed, the

Union and Defendant agreed which pieces of equipment the operation of which would fall within

the scope of the 2006 and 2012 Acceptance of Agreements. Defendant asserts that the Bidwell

Paver is not a piece of equipment the operation of which falls within the letters, which he

contends became a part of the Acceptance of Agreement, and thus the it is no obligated to make

benefits contributions for the hours it paid Miller for the operation of the Bidwell Paver. As

evidence of its understanding that it was obligated to make benefit payments only for the

equipment specified in Article II, Provisions and Limitations, § 4 of the CBA and in the Letters

of Assignment, Defendant explains that in 2006 it made fringe-benefits contributions to Plaintiffs

for the paid-hours that Richard Miller worked, but only when Miller operated machinery other

than the Bidwell Paver.

Plaintiffs respond that under Article V, Fringe Benefit Programs, § 35 of the CBA—

language which has remained in the CBA for decades and which this Circuit has repeatedly and

consistently interpreted—Defendant is bound to pay contributions for all hours paid to any of its

employees, regardless of whether some hours worked involve non-covered work.  § 35 states:

> [f]ringe benefit contributions shall be paid at the following rates for all hours paid
> to each employee by the Employer under this Agreement which shall in no way
> be considered or used in the determination of overtime pay. Hours paid shall
> include holidays and reporting hours which are paid.

This Court's recent holding in *Bunn Enterprises, Inc. v. Ohio Operating Engineers Fringe Ben.*

*Programs*, affirmed by the Sixth Circuit, is dispositive of the issue before the Court. 606 F.

App'x 798 (6th Cir. 2015). *Bunn Enterprises* involved the interpretation of the same CBA at

issue here: the Ohio Heavy Highway Agreement of the International Union of Operating

24

Engineers Local 18. In that case, the plaintiffs argued, like the Defendant here, that the CBA's language required the court to draw a distinction between work covered by the agreement and work that falls outside its ambit with regards to the employer's obligation to make benefits contributions for the hours its employees worked. *Id.* at *3 (6th Cir. Apr. 1, 2015). Specifically, they contended that the employer was only obligated to pay employees when employees performed the type of work expressly outlined in Article I of the CBA, which defined what constituted "work" under the CBA and stated that work was defined within the "jurisdiction" covered by the CBA, only. *Id.* Thus, *Bunn Enterprises* presented more extreme circumstances in which the work performed by the defendant's employees did not fall within the jurisdiction assigned to the union and/or within the definition of work in the CBA. Nonetheless, the Sixth Circuit affirmed the decision of this Court, holding "that the CBA unambiguously requires employer signatories to contribute the appropriate benefits contributions for all hours worked by their employees, regardless of whether those hours are 'covered' under the contract." *Id.* at *5. So too here, Defendant is an employer signatory to the CBA, and thus he is required to contribute the appropriate benefits contributions for all hours worked by his employees, including the hours Miller operated the Bidwell Paver.

Further, a plain reading of the CBA also shows that neither it nor the Letters of Assignment limited Defendant's obligation to pay fringe benefits only for those hours his employees operated equipment listed in Article II § 4. Article II § 4 of the CBA mandates that Defendant hire Union members to operate certain types of equipment. Unrelated to that requirement, § 35 demands that any employer-signatory to the CBA must pay fringe benefit contributions for all paid-hours worked by any of its employees. The fact that § 4 requires the employer only to hire union members for the operation of certain equipment does not have any

implications for what work, in total, is covered or not covered by the CBA. Further, by their language, the Letters of Assignment are nothing more than an acknowledgment that Defendant possesses equipment which, under Article II, § 4, the Defendant was required to hire Operating Engineers exclusively for their operation. Again, such letters do not indicate that Defendant is obligated to pay fringe benefits only for those employees who operate equipment which Defendant must assign to Union members. Regardless, the holding in *Bunn Enterprises* is unequivocal that an employer signatory "is responsible for payment for all hours worked, without distinction." *Id.* at *1.

Defendant urges this Court to follow, instead, *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.,* 30 F.3d 692, 697 (6th Cir.1994), as well as *Trustees of Painters Union Deposit Fund v. Ybarra Const. Co.*, 113 F. App'x 664, 668-69 (6th Cir. 2004), which applied the rationale in *Grimaldi*. The plaintiffs in *Bunn Enterprises* similarly attempted to rely on *Grimaldi* for the identical purpose that Defendant relies on it in this case. The Sixth Circuit in *Bunn Enterprises* summarized the plaintiffs' argument related to *Grimaldi* at follows:

> The employer, *Grimaldi*, failed to make payments to the ERISA fund for hours worked by some of its employees. *Id.* at 693–94. The ERISA fund manager attempted to audit *Grimaldi's* payroll records, but found them so vague and incomplete that it was impossible to determine which hours had been performed pursuant to the agreement. *Id.* at 694. The fund manager therefore demanded contributions for all hours the employees had worked, and the parties proceeded to suit. *Id.* We held that, because Grimaldi was required to maintain accurate records under ERISA, the company's failure to do so meant "[t]he burden thus shifted to Grimaldi to prove what work was covered and what work was not covered" under the agreement. *Id.* at 696. Accordingly, Plaintiffs claim, we have recognized a distinction between "covered" and "not-covered" work as essential to determining what contributions must be made under a collective bargaining agreement, and therefore must continue to recognize that distinction here.

2015 WL 1447119, at *4. The Sixth Circuit distinguished *Grimaldi*, finding that the issue before the court in that case was "whether Grimaldi had effectively forfeited an undisputed right to pay

solely for 'covered' work by failing to keep adequate records," and thus "the distinction between 'covered' and 'not-covered' work was not before the court—or even contested by the parties—in *Grimaldi*," which was, of course, the central issue in *Bunn Enterprises*, as it is here. *Id*. The Sixth Circuit found, additionally, that despite the holding in *Grimaldi*, for the past twenty-two years, "the District Court for the Southern District of Ohio has unanimously held that employer signatories of the Ohio Heavy Highway Agreement are required to pay contributions for all hours worked, regardless of whether the hours are 'covered' under the CBA." *Id*. (citing *Bunn Enters. Inc. v. Ohio Operating Eng'rs Fringe Benefit Programs (Bunn II),* 7 F.Supp.3d 752, 756–58 (S.D.Ohio 2014) (discussing *Noe v. R.D. Jones, Excavating, Inc.,* 787 F.Supp. 759, 764–65 (S.D.Ohio 1992); *Orrand v. Maint. Unlimited, Inc.,* No. 2:96–CV–00766, Doc. 17 at 4–5 (S.D.Ohio Feb. 24, 1998); *Orrand v. Shope,* No. C2–00–1161, 2001 WL 1763437, at *3 (S.D.Ohio Jan. 30, 2001); *Orrand v. Keim Concrete Pumping, Inc.,* No. 2:08–CV–1046, 2010 WL 3447647, at *16 (S.D.Ohio Aug. 30, 2010))).

In sum, Defendant's reliance on *Grimaldi* is unavailing; this Court, affirmed by the Sixth Circuit, laid this exact issue to rest in *Bunn Enterprises*, and sees no reason to revisit it in the case *sub judice*.

## E.  Equitable Estoppel

Defendant asserts that Plaintiffs should be equitably estopped from pursuing the delinquent contributions. In past ERISA cases, the Sixth Circuit has found that all of the following common-law elements must be met in order to sustain an equitable estoppel defense:

> 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party

asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Trustees of Michigan Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000). *See also Teamster's Local 348 Health and Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 319 (6th Cir.1984) ("Estoppel requires a representation, to a party without knowledge of the facts and without the means to ascertain them, upon which the party asserting the estoppel justifiably relies in good faith to his detriment.").

Defendant argues that the following facts satisfy the first element of the test for equitable estoppel: (1) the Letters of Assignment that the Union sent to Berasi to sign, which the Defendant alleges limited the equipment covered by the CBA, constitute a misrepresentation of a material fact; and (2) the failure of the Funds and the Union, from 2006 until the filing of this lawsuit, to request that Bridge Overlay make any payments to the Funds with respect to Richard Miller for his operation of the Bidwell Paver. Defendant contends that these facts also satisfy the second and third elements of the test, as they show that the Plaintiffs knew the true facts regarding Defendant's payment obligations, and either intended to deceive Bridge Overlay or were grossly negligent amounting to constructive fraud; and, that they intended Bridge Overlay to act in reliance upon their misrepresentation. Finally, Defendant asserts that the fourth and fifth elements are met as Bridge Overlay was unaware of the true facts and relied upon the representations made to it when they paid Miller prevailing wages which included amounts equivalent to the allegedly delinquent contributions.

Before determining whether the facts of this case permit this Court to estop the Plaintiffs from collecting the contributions, this Court must determine to what extent the defense of equitable estoppel can be asserted in this type of collection action.

28

Defendant relies on *Bloemker v. Laborers' Local 265 Pension Fund* for the general proposition that within the Sixth Circuit, the doctrine of equitable estoppel can be applied generally to pension plan cases as well as health and welfare plan cases. 605 F.3d 436 (6th Cir. 2010). *Bloemker* does not stand for so general a proposition, however, and is easily distinguishable from the case at hand. *Bloemker* involved a union member who was a beneficiary of an employee benefit plan, and who asserted an affirmative claim for equitable estoppel to receive the full amount of benefits that the plan administrator allegedly promised to him. In contrast, the Defendant in this case is an employer who is a party to an ERISA plan, and who raises equitable estoppel as a defense to paying delinquent contributions to a fund. Accordingly, *Bloemker* does not hold that equitable estoppel is a viable defense to a collection action, which, as explained in detail above, is normally subject to fewer common law contract defenses.

In its recent decision in *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, the Sixth Circuit addressed the applicability of equitable estoppel as a defense to a collection action brought by plan trustees to collect delinquent fringe benefit contributions from employers who are a party to a collective bargaining agreement. 783 F.3d 1045, 1055-56 (6th Cir. 2015). As *G & W Construction* is analogous and controlling, it behooves this Court to provide a review of its facts and holding.

In *G & W Construction*, the employers argued that: the union led them to believe that fringe benefits were due for union members only, when in fact they were due for all employees; during past audits the funds did not seek fringe benefits for non-union members; and, the employers detrimentally relied on acts and omissions of the union and the funds in bidding construction work. *Id*. at 1055. The court addressed the employer's equitable estoppel defense by

dividing it into two categories: the equitable estoppel defense asserted against the funds based on the union's conduct; and the equitable estoppel defense asserted against the funds based on its own conduct. *Id.* at 1055-56.

Beginning with equitable estoppel asserted as a defense against the funds based on union conduct, the court first noted that equitable estoppel is not among the few defenses to a collection action that have been permitted thus far by this Circuit. *Id.* at 1056. It then concluded that "because the defendants may not point to the Union's conduct as a basis for equitable estoppel against the Funds, this aspect of the affirmative defense is insufficient as a matter of law . . . ." *Id.*; *see also Id.* at 1053 ("Any conduct of the Union that is contrary to the written provisions of the agreements cannot affect the Funds' right to collect contributions that are due and owing to the Funds").[1]

In terms of analyzing the equitable estoppel defense asserted against the funds based on its own conduct, the court explained that in two prior cases the Sixth Circuit had been faced with the question of whether equitable estoppel was available as a defense in contribution recovery actions, but found it unnecessary to resolve that inquiry because the defendants were not able to satisfy the test for equitable estoppel. *Id.* (citing *Gibbons*, 209 F.3d at 591; *Kohn Beverage Co.,* 749 F.2d at 319–20). Following suit, the *G & W Construction* court found it unnecessary to

---

[1] *G & W Construction* cites to *Dassault Systemes, SA v. Childress*, 663 F.3d 832, 846 (6th Cir. 2011) for this proposition, but this was likely in error, as that case does not concern defenses to an ERISA collection action. This Court assumes that when the *G & W Construction* court asserted that an employer may not point to the union's conduct as a basis for equitable estoppel against the funds, the court was referring to its earlier citation to *Behnke, Inc.,* 883 F.2d at 462–63, and *Gerber Truck Serv., Inc.,* 870 F.2d at 1151, a case which held that the conduct of the union that is contrary to the written provisions of the agreements cannot affect a fund's right to collect contributions that are due and owing to it. *See G & W Const. Co.*, 783 F.3d at 1053.

decide the matter, as the defendant similarly could not establish the elements of equitable estoppel. Nonetheless, before applying the test for equitable estoppel, the *G & W Construction* court noted its agreement with the *Gibbons* court that:

> [as] a matter of policy ... equitable estoppel of third party enforcement of collective bargaining agreements governed by ERISA may well conflict with Congress's objectives in enacting ERISA, *i.e.,* that establishment of employee benefits funds by such plans be in writing and that the funds' fiscal health remain secure.

*Id.* (citing *Gibbons*, 209 F.3d at 595). Consistent with the rationale in *Gibbons*, the *G & W Construction* court then held that the defendants could not make out a claim for equitable estoppel since they could " 'consult the agreements themselves…to acquire knowledge by reasonable diligence' concerning their obligation to pay contributions for non-union member," and, thus, they could not prove that they were without knowledge of the material facts or without the means to ascertain them. *Id*. For the same reason, they could not establish their reliance was justifiable:

> An employer's failure to review the collective bargaining agreements and related plan documents defeats any claim of ignorance, and the defendants' reliance on the Funds' words and actions during previous audits, 'in the face of the explicit terms of the agreements establishing' their duty to contribute to the Funds, 'cannot be described as justifiable.' *Id.; Sprague,* 133 F.3d at 404 ("[R]eliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party.")

*Id.*

First, pursuant to *G & W Construction*, the defendants may not point to the Union's conduct as a basis for equitable estoppel against the Funds. Second, the only action directly attributable to the Funds is their seven-year delay in collecting any fringe benefits payments from Defendant for the hours it paid Miller to operate the Bidwell Paver, particularly after Defendant made some payment in 2006 for Miller's "covered" work. Just as the court concluded in *G & W*

31

*Construction*, this Court need not determine whether equitable estoppel is available as a defense because the Court concludes that Defendant's failure to review the CBA in order to ascertain his obligation to make fringe benefits payments for all employees defeats its claim of ignorance, as well as any assertion of justifiable reliance on the Funds' failure to collect. Thus, Defendant's equitable estoppel defense fails as a matter of law.

### F.  Laches

Defendant asserts laches as a defense to Plaintiffs' collection action.  A party claiming laches must prove two elements: "(1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party." *G & W Const.,* 783 F.3d at 1053 (citing *Brown–Graves Co. v. Cent. States, Se. & Sw. Areas Pension Fund,* 206 F.3d 680, 684 (6th Cir. 2000); *PACE Indus. Union–Mgmt. Pension Fund v. Dannex Mfg. Co.,* 394 Fed.Appx. 188, 195–96 (6th Cir. 2010)). Defendant asserts that Plaintiffs' delay in collecting was over seven years, from the execution of the Acceptance of Agreement in April 2006, until 2013 when the Plaintiffs started the process that led to this litigation. The Plaintiffs filed their original complaint on February 13, 2014.

In *G & W Construction* the Sixth Circuit analyzed whether a laches defense to an ERISA collection action such as this is permissible. 783 F.3d at 1054. This Court outlined the facts of *G & W Construction* in the preceding section. The *G & W Construction* court noted that the Supreme Court recently held in *Petrella v. Metro–Goldwyn–Mayer, Inc.,* —— U.S. ——, 134 S.Ct. 1962, 1972–74, 188 L.Ed.2d 979 (2014) that "where Congress has established a statute of limitations (such as the three-year limitations period in the Copyright Act), laches may not be invoked to bar damages relief if the action was brought within the limitations period." *Id.* The court then determined that "[b]ecause ERISA does not provide a statute of limitations for ERISA

32

collection actions, we, like other circuits, apply the limitations period for the state cause of action that is most analogous to the ERISA claim at issue." *Id.* (citing *Cent. States Se. & Sw. Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098, 1107 (6th Cir.1986) (*en banc*); *Trs. of Wyo. Laborers Health & Welfare Plan v. Morgen & Oswood Constr. Co., Inc. of Wyo.,* 850 F.2d 613, 620–21 (10th Cir.1988) (listing cases)). The court concluded that it was most analogous to the forum state's, Michigan's, statute of limitations for contract actions, which was six-years. *Id*. The court held, accordingly, that "[b]ecause the suit was brought within the six-year statute of limitations for contract actions in Michigan, the defendants may not shorten the limitations period by asserting a laches defense against the Funds." *Id*.

Pursuant to *G & W Construction*, this Court must apply the statute of limitations for contract actions in Ohio to determine to what extent, if any, the defense of laches applies to this ERISA collection action. In 2006, when the parties entered the contracts at issue, the statute of limitations for contracts in writing, which were not for sale of goods, was fifteen years under Ohio Rev. Code § 2305.06; the statute was amended effective September 28, 2012, at which time the statute of limitations was changed from fifteen to eight years. *Buchanan v. Hamilton Cnty. Sheriff's Dep't*, No. 1:10-CV-503, 2012 WL 6761507, at *3 (S.D. Ohio Nov. 26, 2012). Thus, laches cannot be invoked to bar relief in this ERISA collection action, as the alleged delay in this case is no more than eight years, which is within the statute of limitations.

## V.    CONCLUSION

In conclusion, this Court hereby **GRANTS** Plaintiffs' motion for summary judgment, and **DENIES** Defendant's cross-motion for summary judgment, as Defendant's five defenses all fail as a matter of law. In its briefing, Defendant does not challenge or dispute the findings of the audit of its payroll records; instead, it raised only defenses to contract formation and

enforcement. Accordingly, this Court **GRANTS** Plaintiffs the relief they seek according to the audited period of April 1, 2006 to April 1, 2014:

1. Delinquent fringe benefit contributions for the period April 1, 2006 to April 1, 2014 in the amount of $102,895.91 under 29 U.S.C.§ 1132(g)(2)(A);

2. Interest in the amount of $85,985.03 calculated to January 15, 2015, plus $50.75 per day thereafter as long as the judgment remains unpaid under 29 U.S.C. § 1132(g)(2)(B);

3. Statutory interest in the amount of $85,985.03 calculated to January 15, 2015, plus $50.75 per day thereafter as long as the judgment remains unpaid under 29 U.S.C. § 1132(g)(2)(C);

4.  Attorneys' fees under 29 U.S.C. § 1132(g)(2)(D), to be determined after the entry of judgment; and

5.  Court costs in the amount of $400.00, under 29 U.S.C. § 1132(g)(2)(D).

**IT IS SO ORDERED.**

**s/Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Court Judge**

**DATE: September 15, 2015**

34